[No. G028243. Fourth Dist., Div. Three. May 22, 2002.]

THE MONEY STORE INVESTMENT CORPORATION, Plaintiff and Appellant, v.
SOUTHERN CALIFORNIA BANK, Defendant and Respondent.

724

**COUNSEL**

Miller, Starr & Regalia, Scott A. Sommer; Saxon, Barry, Gardner & Kincannon, Jeffrey B. Gardner and Laura J. Petrie for Plaintiff and Appellant.

Kester & Quinlan, Steven L. Kester, Francis E. Quinlan; Dorsey & Whitney and Patrick J. McLaughlin for Defendant and Respondent.

**OPINION**

**O'LEARY, J.**—The Money Store Investment Corporation (the Money Store) appeals the judgment entered after the trial court granted summary

judgment in favor of Southern California Bank (the Bank), contending there was a triable issue of fact concerning the Bank's disbursal of loan proceeds contrary to the Money Store's instructions in an escrow transaction. We reverse with directions.

Robert McKinley contracted with Teddy Springfield to buy Springfield's chiropractic practice. To facilitate the purchase, Springfield and McKinley entered into an escrow with the Bank. The escrow instructions the parties submitted on May 23, 1997, reflected a purchase price of $450,000. McKinley was to secure a Small Business Administration (SBA) guaranteed loan in the amount of $497,000. Of that amount, $450,000 represented the purchase price, $35,203 was designated as working capital, and $11,797 was for the SBA loan guaranty fee.

Under the escrow instructions, the Bank was authorized to comply with the lender's instructions and to provide copies of the escrow instructions, amendments, and other exhibits the lender might request. The escrow was to close on or after June 25, and all net proceeds due to Springfield were to be paid to Attorney Robert Johnson, who was to hold them in his trust account pending receipt of disbursement instructions from McKinley and Springfield.

On June 24, the Money Store transmitted "closing instructions" to the Bank. These instructions indicated $485,203 (the sale price plus working capital funds) would be wire transferred to the Bank "upon demand and compliance of [sic] [the Money Store's] instructions."

The instructions directed disbursal of $450,000 to Springfield and $35,203 for working capital and indicated the Money Store would pay the loan guaranty fee directly to the SBA. The instructions directed the Bank to provide the Money Store "[p]rior to close of escrow . . . with an estimated closing statement for [Money Store's] review and approval." They indicated any deviation from the instructions without the Money Store's express authorization would be at the Bank's risk.

The Bank acknowledged receipt and acceptance of the instructions on June 25. The same day, Springfield and McKinley submitted to the Bank an addendum to their original instructions. In it, they agreed that from the Springfield's proceeds held by Johnson, $6,191.91 would be paid to Dottie's Billing Service and $172,685.88 would be paid to McKinley. Springfield was to retain "100% interest in [the] medical lien existing with the attorney for the TRAN FAMILY accident case."

The Money Store wired loan funds to the Bank on June 25.[1] The same day, the Bank closed the escrow. It mailed the Money Store a copy of the addendum to the escrow instructions. By the end of the next day, June 26, the Bank had distributed $131,717.61 of the loan proceeds. It transmitted $334,965.82 to Attorney Johnson on July 1. The Money Store claimed it would not have closed the loan had it known of the change in terms.

McKinley defaulted on the loan and declared bankruptcy. The Money Store sued the Bank, alleging causes of action for breach of contract, negligence, and equitable estoppel. The Bank filed a motion for summary judgment, or summary adjudication in the alternative, and the trial court granted summary judgment.

■ "Summary judgment is a drastic procedure and 'should be used with caution so that it does not become a substitute for trial.' [Citation.] However, summary judgment is proper where the affidavits show, as a matter of law, the plaintiff cannot prevail against the moving party. [Citation.]" (*Sutake v. Orange County Federal Credit Union* (1986) 186 Cal.App.3d 140, 143 [230 Cal.Rptr. 351].) We review a grant of summary judgment de novo (*D'Aquisto v. Campbell Industries* (1984) 162 Cal.App.3d 1208, 1212 [209 Cal.Rptr. 108]), resolving doubts as to whether the motion should be granted against the moving party. (*Jos. Schlitz Brewing Co. v. Downey Distributor* (1980) 109 Cal.App.3d 908, 914 [167 Cal.Rptr. 510].) The motion must be granted when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Barkley v. City of Blue Lake* (1996) 47 Cal.App.4th 309, 313 [54 Cal.Rptr.2d 679].)

The facts are gleaned from the parties' papers in support of and opposition to the motion, construing them as we must in a light most favorable to the party against whom judgment was entered. (*Malmstrom v. Kaiser Aluminum & Chemical Corp.* (1986) 187 Cal.App.3d 299, 313 [231 Cal.Rptr. 820].) However, a reviewing court may uphold the grant of summary judgment if it can be sustained on any grounds, even those on which the trial court did not rely. (*Id.* at pp. 307-308.)

The Bank argues summary judgment was proper on the breach of contract cause of action because: (1) the Money Store and the Bank were not parties

---

[1] There is some conflict as to how much money was wired. In opposition to the motion for summary judgment, one of the Money Store's employees averred the amount was $497,000, the total loan amount. On the other hand, the Bank's disbursement statement show the amount as $485,203, which would comport with the amount the Money Store's closing instructions said would be transmitted. This disparity is not material to our resolution of the appeal, however.

to a contract; (2) the Money Store reserved the right to withdraw or amend its instructions at any time; (3) there was no consideration for a contract; and (4) the Bank did not breach any contract.[2] The Bank is wrong on all counts.

■ The Bank claims, without citing authority or the record, that no contract existed between it and the Money Store because the closing instructions "were provided to facilitate the Bank's performance of its obligations under the [e]scrow [i]nstructions, not to create a separate contractual agreement . . . ." Not so.

■ "An essential element of any contract is 'consent.' [Citations.] The 'consent' must be 'mutual.' [Citations.] 'Consent is not mutual, unless the parties all agree upon the same thing in the same sense.' [Citations.] [¶] 'The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe.' [Citation.]" (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811 [71 Cal.Rptr.2d 265].)

■ The Bank and the Money Store objectively exhibited mutual consent. The Money Store agreed to provide the loan funds to the Bank to facilitate the sale, which was the subject of the escrow, on condition the money would be distributed in a certain manner and the Money Store would be notified before any changes were made to the escrow instructions. The Bank acknowledged acceptance of the conditions when its employee signed the acknowledgement and acceptance.

The Bank asserts the agreement was illusory because the Money Store's instructions "reserved the right to withdraw or amend these instructions at any time prior to the close of escrow." ■ The Bank is correct on its general point of law: " 'Where a contract imposes no definite obligation on one party to perform, it lacks mutuality of obligation. It is elementary that where performance is optional with one of the parties no enforceable obligation exists. [Citations.]' " (*Kowal v. Day* (1971) 20 Cal.App.3d 720, 724 [98 Cal.Rptr. 118].)

A corollary to that rule exists, however. An agreement that is otherwise illusory may be enforced where the promisor has rendered at least part performance. (*Burgermeister Brewing Corp. v. Bowman* (1964) 227 Cal.App.2d 274, 280 [38 Cal.Rptr. 597]; see also 1 Witkin, Summary of Cal.

[2]The Bank accuses the Money Store of vacillating over which contract it asserts was breached. Because the Money Store alleged in its complaint that the contract arose from its closing instructions to the Bank, we focus on those instructions as the basis for the contract.

Law (9th ed. 1987) Contracts, § 235, p. 241.) ▮▮▮ The Money Store performed. It provided the loan money necessary to complete the sale. Performance cured any illusory aspect of the agreement.

The Bank urges no consideration existed for the agreement because the closing instructions said the Money Store was "to be at no expense in this transaction." Nevertheless, the Money Store provided consideration. In return for the Bank's promises to disburse the funds as the Money Store designated, not to deviate from the Money Store's instructions except at its own risk, and to provide an estimated closing statement for the Money Store's review and approval, the Money Store deposited the loan funds with the Bank. This was adequate consideration. (See *PMC, Inc. v. Porthole Yachts, Ltd.* (1998) 65 Cal.App.4th 882, 891 [76 Cal.Rptr.2d 832].)[3]

▮▮▮ The Bank contends it did not breach the contract if one existed. It asserts: (1) its duty was to disburse the funds to Attorney Johnson and it complied with that duty; (2) it sent a preclosing estimated closing statement to the Money Store as the Money Store's closing instructions required; and (3) it was not faced with conflicting instructions. We disagree with the first two assertions, so we need not address the third.

As to the first assertion, the Bank may confuse its duties under McKinley and Springfield's instructions and its duties under the Money Store's instructions. Under the former, including the addendum, the Bank was to pay the proceeds to Johnson. Under the latter, it was to pay $450,000 of the proceeds to Springfield and $35,203 to McKinley.

If Johnson was the Bank's agent, the Bank had a duty to ensure he disbursed the monies in accord with the Money Store's instructions, and arguably breached its agreement with the Money Store when he did not.[4] If Johnson was not the Bank's agent, the Bank arguably breached its agreement with the Money Store when it paid the funds to Johnson rather than to Springfield and McKinley as the Money Store directed.

The Bank may also have breached the agreement in another fashion. The Money Store's closing instructions required the Bank to provide the Money Store with an estimated closing statement for its review and approval before the close of escrow. The Bank claims it complied with its duty by sending a preclosing estimated closing statement by telefax to the Money Store on June 24, the day before escrow closed.

---

[3]Because we analyze the Money Store's closing instructions as a contract and not as an escrow, we need not address the Money Store's claim that no consideration was necessary.

[4]We say "arguably" because we do not purport to make such a finding as a matter of law. We merely conclude there is evidence on which such a finding could be based.

The Money Store disputes whether this is so, and our review of the record indicates a triable issue of fact exists concerning whether the telefax was sent and received.[5] But even if it were clear the telefax was sent and received, a triable issue of fact would remain.

If the telefax was sent on June 24, it was before the Bank received the addendum to the escrow instructions that changed the anticipated instructions. The June 24, document shows a debit of $450,000 for purchase of the practice and $35,203 as a credit for working capital. It says nothing about the $172,685.88 payment to McKinley. Moreover, nothing shows the Money Store approved the preclosing statement, as required by the Money Store's instructions.

A fair interpretation of the Money Store's instructions is it wanted the ability to determine before the close of escrow whether funds were being disbursed as its instructions required and to be able to prevent the disbursement of funds if they were not. To the extent the instructions may be read otherwise, they are at least ambiguous, and the parties disagree over the correct interpretation and the evidence surrounding it. Under these circumstances, summary judgment is improper. (*WYDA Associates v. Merner* (1996) 42 Cal.App.4th 1702, 1713 [50 Cal.Rptr.2d 323].)

A triable issue of fact exists as to the contract cause of action, the trial court erred by granting summary judgment, and we must reverse. But because the Bank sought summary adjudication of the other causes of action and for guidance on remand, we will address the other causes of action as well.[6]

■ Addressing the cause of action for negligence, we note our Supreme Court recently considered the ability of a lender to sue an escrow holder for breach of fiduciary duty and negligence in *Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.* (2002) 27 Cal.4th 705 [117 Cal.Rptr.2d 541, 41 P.3d 548]. There, as part of the sale of real property, the parties instructed the escrow holder to pay off a note that was secured by the property.

---

[5] In response to the Money Store's motion to vacate the judgment *after* summary judgment was granted, the Bank produced a telefax cover sheet that reflects the transmission of an estimated closing statement on June 24. Gloria Garriott, the Bank's escrow officer, testified the cover sheet appeared to be the type she or her assistant would have prepared. Her testimony raises a question of fact as to whether she had personal knowledge and recollection of the event. It does not address whether or when the telefax was received, and the Bank did not provide a confirmation of receipt.

[6] Because it is not necessary to our decision, the following discussion is dictum. And, if the Money Store prevails on its cause of action for breach of contract, the other two causes of action may become moot.

Although the original lender had assigned its rights in the note to a new lender when the property was refinanced, a transaction of which the escrow holder was aware, the escrow holder paid the original lender pursuant to the parties' instructions. The new lender sued the escrow company. (*Id.* at p. 708.)

The Supreme Court held no cause of action lay for breach of fiduciary duty or negligence. (*Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co., supra,* 27 Cal.4th at p. 711.) With regard to the negligence cause of action, the court recognized " 'the general rule that an escrow holder incurs no liability for failing to do something not required by the terms of the escrow or for a loss caused by following the escrow instructions. [Citation.]' " (*Id.* at p. 715.) It considered whether the circumstances of the case merited a departure from that rule. (*Ibid.*)

The court applied a six-part test to determine whether the escrow holder owed a general duty to the new lender. The court found the escrow company's compliance with its escrow instructions was not morally blameworthy, it was not reasonably foreseeable the original lender would fail to disburse the funds to the new lender as it had agreed to do, and there was not a sufficiently close connection between the escrow holder's actions and the harm the new lender suffered because the injury was primarily caused by the original lender's breach of its agreement with the new lender. (*Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co., supra,* 27 Cal.4th at pp. 715-716.)

This case is distinguishable. Unlike the new lender in *Summit,* the Money Store had a direct contractual relationship with the Bank. The contract specified what the Bank was to do. McKinley and Springfield authorized the Bank to comply with those directives. The Money Store's instructions were at least consistent with McKinley and Springfield's original instructions. When the Bank received the addendum, which changed the deal and expressly varied from the Money Store's instructions, the Bank apparently complied with the addendum without providing the Money Store with an opportunity to object.

Under these circumstances, the Bank's action—if true as alleged—was morally blameworthy. It was foreseeable the funds would be distributed contrary to the Money Store's instructions. And, there was a close connection between the Bank's action and the harm suffered.

There is, nevertheless, a problem with the Money Store's negligence cause of action. In essence, the Money Store alleges the Bank breached a duty to it by failing to perform as specified in the Money Store's instructions.

"The Supreme Court has rejected the transmutation of contract actions into tort actions 'in favor of a general rule precluding tort recovery for noninsurance contract breach, at least in the absence of violation of "an independent duty arising from principles of tort law" [citation] other than the bad faith denial of the existence of, or liability under, the breached contract.' [Citation.]" (*Brown v. California Pension Administrators & Consultants, Inc.* (1996) 45 Cal.App.4th 333, 346 [52 Cal.Rptr.2d 788].) As alleged, the Money Store's cause of action for negligence would be subject to summary adjudication because it does not state a negligence cause of action apart from its contract cause of action.

■ The Money Store's cause of action for equitable estoppel fails as well. "[Equitable estoppel] . . . is [a] doctrine which prevents a party from profiting from the detriment he induced another to suffer. 'The doctrine acts defensively only. It operates to prevent one from taking an unfair advantage of another but not to give an unfair advantage to one seeking to invoke the doctrine.' [Citation.]" (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1144 [234 Cal.Rptr. 630] [doctrine could not be used as an affirmative theory on which to base the collection of royalties]; see also *Green v. Travelers Indemnity Co.* (1986) 185 Cal.App.3d 544, 555 [230 Cal.Rptr. 13].)

The Money Store pleaded equitable estoppel as a separate cause of action. It cannot stand as such.

The Money Store urges that its estoppel cause of action actually sounds in promissory estoppel. Even if it did, however, it was not a viable cause of action. The doctrine of promissory estoppel provides a substitute for consideration to allow enforcement of a promise. (*Sutherland v. Barclays American/ Mortgage Corp.* (1997) 53 Cal.App.4th 299, 312 [61 Cal.Rptr.2d 614].) As we have noted, either adequate consideration existed here, or it was rendered moot by the Money Store's performance of its obligations under the agreement. A cause of action for promissory estoppel would be superfluous. Summary adjudication would be proper as to the Money Store's cause of action labeled "equitable estoppel."

The Bank argues summary judgment was justified based on several of its affirmative defenses. The Bank noted in its moving papers that summary judgment is an appropriate vehicle by which to test the validity of the plaintiff's claims and the defendant's affirmative defenses, but it did not set forth any affirmative defenses it claimed it had established as a matter of law. Since the Bank did not effectively raise that ground in the trial court, it

may not do so here. (*Martinez v. Scott Specialty Gases, Inc.* (2000) 83 Cal.App.4th 1236, 1249 [100 Cal.Rptr.2d 403].)

The judgment is reversed. The trial court is directed to grant the Bank's motion for summary adjudication on the negligence and estoppel causes of action. The Money Store is entitled to its costs on appeal.

Rylaarsdam, Acting P. J., and Moore, J., concurred.

On May 29, 2002, the opinion was modified to read as printed above.